And we'll move on to our last argument for the week. Centeno v. Garland, case number 21-71031. Good morning, Your Honors. May it please the Court, my name is Rebecca Marcys, and I, along with Student Co-Counsel Katrina Uehara, are appearing today on behalf of the petitioner, Mr. Jaime Centeno. We're joined here today by Supervising Attorney Tiffany Gates, and I plan to reserve three minutes of my time for rebuttal. Your Honors, this Court should grant Mr. Centeno's petition because when the threats of torture he faces are considered in the aggregate, as they must be in a CAT claim, the record shows he will more likely than not be tortured by members of the cartel, mental health workers, or both. I hope to address both threats today, but I'd like to begin by addressing the question of specific intent, the subject of the 28J filings regarding Penaloza and Iglesias. Our record, like that in Iglesias, is replete with evidence of the abusive treatment in Mexico's mental health institutions, treatment that has no medical purpose, but instead persists because of officials' specific intent to harm the mentally ill. I don't think that's the case. I have read our recent memorandum disposition in Iglesias, and I read the 2013 report. It has some harrowing sections in there, reflective of probably conditions that used to be in mental institutions in a lot of places, including the United States, but not for quite some time. Can you point to me any page in the record where it suggests that we've satisfied specific intent? That is, that people who work in mental institutions in Mexico intend to create severe pain or suffering in the patients that they are treating. Now, that's different from, I want you to understand, I think that's different from having inadequate resources or having to restrain people for lengthy periods of time because they will harm themselves or harm someone else. And thus, we have people who are suffering, but I want to know where the evidence is that mental health workers in Mexico specifically intend to create pain and mental suffering in their patients. Specific intent is in our record in a few different places. On 348 of the record, there's evidence that excessive doses of psychotropic medication are administered. That could cause permanent damage to nerves. Okay. Now, again, you know, that could be medical negligence. So the fact that medications are being provided, unless no psychotropic medications can be issued at all, but if psychotropic medications are indicated for anything, the fact that they may be overprescribed may be indication of medical negligence but not specific intent. So do you have, on page 348, will we find evidence of specific intent? So as in Iglesias, the use of excessive doses of medication in conjunction with physical long-term restraints, that is, those are used to coerce, control, and subdue patients. That's language from Iglesias. Those are not legitimate treatment purposes. Torture can't be a legitimate treatment. There's also evidence that lobotomies are performed that only require the approval of the facility director. And is that evidence from 2013, or is that more current? That's from 2013. Do we take into account at all the fact that the evidence is nine years old? Well, Your Honor, in 2019, the State Department issued a human rights report that's also in this record that confirmed basically everything that was in the DRI report, including physical and chemical restraints, psychosurgeries, sexual abuse was still occurring in mental hospitals, and that the Mexican government was not effectively enforcing its anti-discrimination laws. So, counsel, I'm looking at page 348, which is part of that 2013 report. And so I'm looking at what I think is paragraph 3, which I think is what you're referring to. So the report says that at these facilities, many people appeared highly sedated, suggesting that high dosages of psychotropic medications are common. Again, that doesn't indicate a specific intent or that they weren't medically indicated. In short-term facilities, let's see, the exclusive long-term reliance on psychotropic medications, particularly without very careful patient records and monitoring of side effects, can lead to disabling side effects, irreversible nerve damage, and sudden death. Now, where is the evidence that this is not a matter of medical negligence and inadequate resources, but that these people actually intend to induce this in them? So, as in Iglesias, the degree of cruelty should be attended to here. And that indicates that, in addition to the long period of time that Mexico has known about conditions in its mental health facilities without making any improvements, indicates that they're okay with torture. The people who work in the facilities may – we can also infer that stigmas and anxiety towards people specifically with mental illness like Mr. Centeno, schizophrenia, illnesses that cause hallucinations or interactions with one's hallucinations, those are viewed in Mexican society as locura as opposed to nervios, which is more stress and anxiety. And people who are deemed locura are assumed to be dangerous, they are discriminated against, and they are stigmatized. And Mr. Centeno is very likely to be perceived as such if he's returned to Mexico. Kagan. Well, going back to the mental hospitals, didn't the IJ suggest that it was speculative to think that he was going to end up in a mental institution because there wasn't any evidence that he wouldn't have access, the ability to access the medication that keeps his symptoms somewhat under control, and that his own testimony was that sometimes he forgets to take his medication, but if his symptoms start getting worse, then he takes his medication. And so even if we thought the evidence was sufficient to show specific intent in a mental institution or in a mental hospital in Mexico, didn't the IJ also find, based on substantial evidence, that that was highly speculative in suggesting that's inevitably where he will end up? Your Honor, none of the IJ's conclusions about Mr. Centeno's mental health-related torture likelihood are supported by substantial evidence. The IJ cited to an article about health care reform generally that makes no mention of mental health care. He cited to the fact that the DRI report was based on visits to 22 institutions, but that's out of 30 total in the country, so the report was reporting on more than half of the institutions. And it's also important to consider that Mr. Centeno doesn't only face threats in the context of his mental health treatment in Mexico, but also because members of the Arellano-Felix cartel have designated him a snitch and have threatened him with death on three occasions. Alito, before you move on to the cartel, I'd like to follow up on Judge Bolton's question, because I think it was a really, really a very, very good question. So the IJ, as I understood Judge Bolton's questions, was the IJ said he can control his schizophrenia by taking medications. And I believe that there is a doctor's report that says that he is medication compliant, and that if he sometimes forgets to take it, that he will remember then later on. If that's the case, then what's wrong with the IJ's? Why doesn't that support the IJ's conclusion that it's not likely that he will end up in a Mexican mental institution? He is the fact about the cartel is relevant in the likelihood analysis in that it takes him, in order to flee the danger of the cartel, takes him out of Tijuana where he might have support. Then he's in one of the five states that Arellano and its ally, CJNG, control, or rather the five states they don't control. And we know that Mexican mental health care, what the record indicates is that Mexican mental health care is an all-or-nothing proposition. There is the record is full of evidence that the kind of treatment that Mr. Centeno does well with, like medication For example, do the five states that this cartel does not have control over, does that include Mexico City? Your Honor, I'm not sure. I don't have that at my fingertips. Okay. So I'm just wondering, I mean, if there are other, I mean, if he can't be in Tijuana, Mexico City is a long way from Tijuana. It's also a very, very large, very, very sophisticated city, suggests that he would be able to get, to have access to the And so where, what's wrong with the logic there? Where is the likelihood that he is going to end up in a mental institution where he would be tortured? The problem is that there's, the record shows there's nothing, there's no community integrated care for people with severe mental illness in Mexico. So even if he was in a metropolitan, cosmopolitan area like Mexico City, he is still likely, because he has schizophrenia, to be sent to an institution. In Mexico, you either get no treatment if you have severe mental illness or you're institutionalized. But he had that mental illness when he lived in Mexico before, right? That's correct. And he wasn't, was he sent to an institution? Well, in fact, there's evidence in the record from the forensic evaluation, the therapist's evaluation, that he may have indicated symptoms before, but he only And he reports that his symptoms worsened after he had this interaction with the cartel. So that's your, your contention is we can't look to past precedent because it's, it would be different now if he went back. Yes. And the IJ cited a two-week period that he was in Mexico in 2017 and didn't attract the attention of law enforcement as evidence that he wouldn't. And that's, it's not supported by the record because he was hiding from the cartel during those two weeks. He was holed up in a hotel. And as soon as he, it only took two weeks for the cartel to learn he was there and to send a message to him that they knew he was there. And then he fled back to the United States. The likelihood that Mr. Centeno will be subjected to the most barbaric treatments that we have in this record is only heightened because of his specific mental illness and the fact that we know from the record he does experience hallucinations and interacts with them. He sees green goblins. He saw them during his testimony in front of the IJ. And he experiences that even on medication. And the record, the DRI report, indicates that the worst treatments tend to be injurious or unruly is a word that is used in the report. So on the one hand, the treatment in Mexico in mental health facilities seems pretty indiscriminate. And in addition, Mr. Centeno is almost certain to get that kind of treatment because he may present in their minds as unruly. Your Honors, I see that I have about three minutes remaining. Thank you, Counsel. Thank you. We'll hear from the government. Thank you, Your Honors. My name is Eric Quick, and I am here on the behalf of the respondent. Petitioner, Your Honors, articulates two primary fears. One is rooted in 10 years ago where he witnessed a kidnapping, which he may or may not have told police about. But nevertheless, he says that he fears an individual named Petey, P-I-T-E-Y, who was then part of the Arellano Felix cartel. And he fears them because not Petey, but other gang members chased him through the streets of Tijuana until he reached the border. And it is this group that he fears all over Mexico, even though according to the own record evidence that he files, it's a regional tollgate organization. It is a shell of what it once was. Its leadership is dead or in prison. And in fact, that entity no longer exists in that 2012 prior form. Then the second component is that mental health aspect. And that itself, as Your Honors have observed, really has two predicates. First, we have to go through that hypothetical chain of events that he will, for whatever reason, become homeless, and he will have police contact or perhaps an arrest of some sort. And that he will then be forcibly institutionalized. This will happen, as the immigration judge alluded to, despite the replacement of that 2003 Seguro Popular National Health Plan with a January 2020 centralized health system. So we have to get to that first forcible institution predicate. And then we have to go to the mental health facility. And the record is clear that they have been historically low funded throughout Mexico. But we have to then conclude that that is a result because the government has a specific intent to torture and not treat the patients. So it is Respondent's position that the record does not compel a finding in either context. Can I ask you about our specific intent standard here? Because there's two ways to look at this. One is they specifically intend to take the actions that they take, meaning they have some really poorly designed standards for treating mental health. They don't think that that's torture, but we say, no, it is torture. If we said that was torture or tantamount to torture, the fact that they had specific intent, does it not only have to go to the actions that they take, or does it have to go to the intent that those actions actually are torture? Well, I think Your Honor goes really to what is on page 29 of our brief where we try to flesh out the difference between the specific intent and then the general intent. So the general intent is what Your Honor refers to. It's the intent to perform an act without the necessary intentional consequences. Where the specific intent is the intent to accomplish that precise criminal act or that intent to actually torture and not treat somebody. So there's a great difference here in the torture predicate or the torture definition. It does not cover, as a matter of JE that we cite on that same page, does not cover negligent acts or harm from a lack of resources. Rather, it is a specific deliberate intent to inflict actual torture. So that's what we have to look for. I hope that I answered Your Honor's question. Thank you. So with regard to the specific intent, it is true, of course, that 2013 Disability Rights International Report cites poor facility conditions throughout Mexico. But it also states that, quote, the problem of public institutions is a result of limited funds. And at least at that time, 2% of the federal budget was allocated to mental health facilities or institutions. And we go through examples of what were then limited financial resources in these mental health facilities. It had to do with toiletries, lack of shoes, lack of bed linen, and whatnot. But again, that was not specific intent. And the Bariantos-Lopez decision we cite, also cited by the immigration judge, refers to the Disability Rights International Report. We don't know whether it was the 2013 version or some other, but it's a 2020 case from this court. And it says, yes. Yes. What do we do then with the declaration in our recent memorandum disposition in Iglesias, Iglesias v. Garland, that the record before us compels the conclusion that officials in Mexican psychiatric hospitals commit serious human rights abuses, not out of ignorance or negligence, but rather with a specific intent to harm patients? Well, I think, Your Honor, it's important to realize that these are individualized, fact-specific cases that are reliant upon what the record – Well, this was not. This was based on – this appears to be based on the same evidence that was in the record here. I think it's probably the same 2013. There are some very striking similarities between the 2013 report in our record and language in our memorandum disposition. That's certainly the case. But – and the immigration judge mentions this fact, and I don't think the Iglesias record contains that Taylor and Francis article that's in our record on pages 270 through 78. Because the Iglesias decision or the review petition was filed in March 2020, that Taylor and Francis article didn't come out until April of 2020. And that is the article cited, which specifically talks about the January 2020 New National Healthcare Initiative throughout Mexico. And it is one that talks about universality of access to care and that it will be free services for everybody and that it shall be anti-corruption. So it is – in other words, Iglesias, Iglesias, there's no indication that the court had the benefit of that report talking about the new revised central healthcare policy that is the reform from the 2003 Segundo Popular health predicate. So we don't know from that at all. Also, Iglesias talks about the – Counsel, how many – do we have published opinions that have been – have addressed this Mexican healthcare or perhaps in other countries face the same issue where it's so deficient that it might be tantamount to torture? Have we addressed this in published cases before to suggest what the standard really needs to be? Well, I believe that the last reported case was the Villegas case in 2008, which the parties do cite. But Your Honor is correct. It seems that since that time, both sets of briefs are citing unreported decisions, albeit they are factually similar. But there is very little reported case law on the specific subject matters we're discussing here today. Is it still a significant concern in the sense that advancements over the last 10 years have not alleviated some of the problems that may have existed previously? I think to answer that question, Your Honor, we would have to know to what extent that January 20th national healthcare reform has changed the system. It certainly – Counsel, did the district – did the IJ take into account that report? He does refer to it. On which page? Page 83 of the record, page 7 of the IJ decision. He talks about – he refers to pages 70 and 78. I see. Exhibit 7. It's about two-thirds of the way down. Yes, article discussing reform to Seguro Popular, which – and he cites the entire article, and that article then talks about reform. Right, right. I don't think he's relied on the facts that you've related from that article. I don't know what was – he's mentioning it. He's the one from page 93 and one from page 94. And he's certainly mentioning it, but we don't know the – the 93 and 94 are not part of that particular article. So – but he is referencing specifically the reform to the healthcare system on the Taylor and Francis article. But, no, Your Honor is correct. He's not parsing out specifics of any new law. He's referring to the – So only pages 70 to 78 is the article. Is that what you're saying, of exhibit 7? I believe so, Your Honor, yes. That's the Taylor and Francis. The following quotations are not from that article, so all he's done is just made reference to it. Exactly. And then using that little parenthetical, presumably to explain very briefly what he's thinking about. Yeah, but he doesn't find that conditions have changed or the conditions are likely to change. He hasn't made any specific findings with respect to the Mexican healthcare system. He does not. Okay. He makes the – I think the point that there was no specific intent to torture, albeit the record contains citations in the DRI report of poor conditions in the facilities. There's no doubt about that. But he concluded, as many others have, that it's not a specific intent to torture. It's simply a lack of resources. Can I answer any other questions on a specific intent? No? I think you've exhausted our questions. Okay. I am happy to go through any other points or concerns or questions the court has. I don't think so. And we've read your briefs, so you'd be well within your right to stand for the remainder on your briefs. Without any questions or concerns that I can answer, we will then stand on our briefs. Yes, Your Honor. Okay. Thank you. Thank you, Counsel. Your Honors, a few points on rebuttal. Mexico is, of course, allowed to allocate its budget as it sees fit to sovereign nation. Two percent of its healthcare budget, or its national budget, goes to mental healthcare. But of that two percent, almost all of it goes to institutions. So none of it goes to a kind of middle ground or behavioral treatment that seeks to keep people involved in the community. The article that the government references on page 270 about the new healthcare plan makes no mention of mental healthcare. And as Judge Biby pointed out, it is just cited to in the general. There's no specific point made. The line in the DRI report about this being the result of limited funds, that's a quote from the chief of psychiatry for the country. The full quote, which actually the IJ includes the full quote, is it's a result of limited funds and misdirected use of funding that is available. And then a little later he says, we know what the problem is and we know how to fix it, but the problem is still there. He calls this a paradox. It's not a paradox. It's a policy decision that Mexico keeps making. And limited funds might explain the conditions that have been described as squalid by decisions of this court, but it cannot explain sexual abuse, the use of lobotomies. Sexual abuse, as this court recently recognized again in Iglesias, cannot be explained as the result of a misunderstanding of the nature of psychiatric illness, which was what? With respect to that, you know, sexual abuse among institutionalized persons is a problem in the United States. It's one that we deal with with the criminal law. Is there any evidence that Mexico tolerates this, that it does not regard it as criminal, that sexual abuse is likely to occur against anyone who is institutionalized? I mean, what these are very, very broad statements about sexual abuse occurring in institutions because that is certainly true of U.S. institutions as well. That's true, Your Honor, and it's awful wherever it happens, but the question is not whether he will be safe from it in an American institution, but rather whether But we have to show, but you have an obligation to show the likelihood that this is going to happen. So without further statistics, very, very difficult for us to assess evidence that there's sexual abuse in Mexican institutions because that appears to be a universal. The record does not contain exact figures on that. I can confirm that the State Department report, which came out only a year before the I.J. made his decision, did confirm sexual abuses were still occurring in institutions and that the government was not doing anything to change it. Just to revisit again, I see my time is almost concluded. May I just wrap up? Yeah, please wrap up. He has known PT, who the government referenced, since he was a child, and there's no reason to think that given that these threats have continued to come that there's any reason that the cartel has forgotten about what they think he did. Thank you very much for your time, Your Honors. Thank you, counsel. Thank you to both counsel for your arguments in this case, and a special thanks to the law students who continually give us good representation in this court. And with that, we are concluded for our arguments this week. Thank you. All rise. This court for this session stands adjourned.
judges: BYBEE, NELSON, Bolton